**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————
                              :
BEUFF ENTERPRISES FLORIDA, INC.,   :
MARY LISBERT and ROBERT GILBERT, :         Civil Action No. 07-2159 (PGS)
                              :
                              :
                              :                **OPINION**
           Plaintiffs          :
v.                             :
                              :
VILLA PIZZA, LLC and WISHWELL      :
INTERNATIONAL, INC.               :
                              :
           Defendants.       :
———————————————————:

**SHERIDAN,  U.S.D.J.**

This case comes before the Court on a renewed motion to dismiss after the Court allowed the Plaintiffs to amend their complaint to properly state antitrust claims, an Americans with Disabilities Act ("ADA") claim, and the liability of Defendant Wishwell.  Defendants now move to dismiss the antitrust claims, ADA claim, and all counts against Wishwell on the same grounds as stated in their previous motion.  This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332.  For the reasons stated below, the motion is granted in part and denied in part.

I.

Plaintiff Beuff Enterprises Florida, Inc. ("Beuff") is a franchisee of Defendant Villa Pizza ("Villa"), a Delaware Limited Liability Company with its principal place of business located in Morristown, New Jersey.  Defendant Wishwell International, Inc. ("Wishwell") is a New Jersey

Corporation with its principal place of business in New Jersey, and is, according to Villa's Uniform Franchise Offering Circular ("UFOC"),[1] the managing member of Villa.[2]  Plaintiffs Lisberg and Gilbert[3] are citizens and residents of Florida and, pursuant to a personal guarantee, have responsibility for losses allegedly caused by Defendants.

In January 2006, Lisberg and Gilbert met with representatives of Villa's Franchise Operations department to inquire about purchasing a Villa Pizza franchise.  Michael Schreffler, the Villa Franchise Operations Consultant, suggested that Plaintiffs consider a Villa project in progress at the new Coconut Point Mall in Estero, Florida, located some 150 miles from Plaintiffs' home.  Dave Ron, Villa's Director of Franchise Development, allegedly told Plaintiffs the franchise would not exceed $400,000 in costs.  The franchise was open in early November 2006.  After meeting with several other company officials on March 8, 2006,[4] Plaintiffs were allegedly reassured that the project would not exceed $400,000 in cost.  Plaintiffs sent a $5,000 deposit to Villa  on March 17, 2006 in order to purchase a Villa franchise.  Plaintiffs entered into a franchise agreement on August 23, 2006.

Plaintiffs moved from their homes to live closer to their new business and received a loan to purchase, build out, and operate the franchise.  Defendants provided a cost analysis for the project

---

[1]  The UFOC is a separate document from the actual franchise agreement and it appears to come into play before the franchise agreement, itself, is actually signed.

[2]  The parties dispute whether Wishwell is the managing member of Villa or just a member of Villa.  However, for purposes of this motion, the distinction is irrelevant.

[3]  Plaintiff Gilbert has a severe form of psoriasis that is relevant to the ADA claim, addressed below.

[4]  Such officials included Dave Ron, Adam Torine (Villa's Vice President of Business Development), Alex Rivera (Villa's Construction Manager), John Drinkard (Villa's Director of Marketing) and a Mr. Scotto (according to Plaintiffs, "an officer of Defendants").

in the amount of $400,164 in July 2006 and suggested several contractors for Plaintiffs to use, who they acquired bids from.[5]   Villa allegedly assured Plaintiffs that the store would open prior to November 10, 2006, the mall's grand opening date.

Plaintiffs claim that Defendants provided them with inaccurate financial information regarding the start-up and operational costs of the business, and that while Defendants promised to have the store open prior to the busy season (November to March), construction was delayed and the store did not open until after the busy season.   Plaintiffs also claim that Defendants did not provide proper or adequate training, and that Gilbert was improperly ejected from the training session by Nick Valavanis (Villa's Director of Franchise Operations).   In addition, Plaintiffs claim that Villa failed to provide operating assistance and manuals, as well as an advertising program as promised.

According to the complaint, paragraph 4 of the franchise agreement required that Plaintiffs purchase equipment, furniture, fixtures, and exterior and interior signs only from sources approved by Defendants.   This requirement allegedly resulted in higher prices paid by Plaintiffs and consequently by the general public because the same quality and quantity of those products could have been purchased on the open market for cheaper.   Similarly, paragraph 22 of the franchise agreement required that Plaintiffs purchase supplies exclusively from suppliers, contractors, and purveyors approved by Defendants.   This requirement allegedly resulted in higher prices paid by Plaintiffs and consequently by the general public because the same quality and quantity of supplies could have been purchased cheaper on the open market.   Plaintiffs allege that their expenditures made the operation of the franchise unprofitable and that Defendants misrepresented the actual costs involved with opening the franchise as well as the chances of the franchise's success, and had Plaintiffs known the accurate information, they would not have purchased the franchise.

---

[5]   The final bid came from MBK Construction in the amount of $296,000.

The majority of this motion to dismiss is directed toward the antitrust claims.  With regard to those claims, Plaintiffs allege that Villa's operation includes an extensive conglomeration of unique products, services, trade dress, methods, ingredients, recipes, menus and packaging, quality and quantity control strategies, layouts, style, signage, service marks, and image, and that Defendants are the only ones who provide this unique combination of products and services.  Plaintiffs accuse Defendants of holding (in interstate commerce) a monopoly as to its pricing policies to franchisees and the public and franchise matters and operations by improperly pricing as to its franchisees and the public, restrictions on purchases and sales by its franchisees, and restrictions on the way franchisees can conduct business.

Plaintiffs also allege that they have been forced to purchase supplies, furniture, equipment, fixtures, and signs from sources designated by Defendants and that Defendants conditioned the sale of the franchise on Plaintiffs' agreement to sell products within the provisions of the franchise agreement.  Such "tying arrangements," Plaintiffs claim, violate federal antitrust laws.[6]  Plaintiffs claim to be the victims of coercion on the part of the Defendants, who allegedly "conspired" with its suppliers and sellers in order to monopolize the market and restrain trade, resulting in higher prices paid by both Plaintiffs and the public.  The tying arrangement allegedly resulted in discrimination against Plaintiffs in prices charged and discounts offered.

Finally at issue in this motion is an ADA claim by Gilbert.  Gilbert, a trained chef, alleges that at the time of his training by Villa Pizza, he had a severe form of psoriasis. According to Gilbert,

---

[6]  The tying product, according to Plaintiffs, is the franchise, including trademarks.  The tied products allegedly included all products and services that the Plaintiffs were required to purchase from Defendants, its suppliers, and contractors with which Plaintiffs were "forced" to do business (as opposed to being able to purchase said products and services cheaper on the open market).

Villa Pizza personnel (Nick Valavanis) required him to leave.[7]  Under protest, Gilbert left and was not allowed to finish his training.   Gilbert filed a EEOC claim.  The EEOC issued a Right to Sue Letter.

Defendants moved to dismiss Plaintiffs' antitrust claims, ADA claim, and claims against Wishwell.  The Court, by Order dated January 23, 2008, denied the motion without prejudice and allowed Plaintiffs to submit a Second Amended Complaint that pleaded a relevant antitrust market, pleaded a proper ADA claim, and established causes of action against Wishwell.  Plaintiffs filed the Second Amended Complaint on January 31, 2008, and Defendants renewed their motion to dismiss on February 14, 2008.  This renewed motion to dismiss is now before the Court.

## II.

On a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium,* 214 F.3d 395, 397-98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir.), *cert. denied, Forbes v. Semerenko,* 531 U.S. 1149, 121 S.Ct. 1091 (2001). While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of

---

[7]  Plaintiffs do not proffer a reason in their complaint as to why Nick Valavanis asked Gilbert to leave except to say that his dismissal was "due to his psoriasis."

factual allegations. *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir.1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir.1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340). The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations and quotations omitted).

III.

Plaintiffs allege that Defendants monopolized the market in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.[8]

---

[8] Section 1 states:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

Section 2 states:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10

In cases pursuant to the Sherman Act, the plaintiff must establish "proof of the relevant market" in order to isolate the "'part' of commerce within which the defendant has allegedly achieved an illegal monopoly position, thereby satisfying the literal statutory language [of the Sherman Act]." William C. Holmes, Antitrust Law Handbook, § 3:4 at 406 (2007); *Jame Fine Chems. Co. v. Hi-Tech Pharmacal Co.*, 44 Fed. Appx. 602, 605 (3d Cir. 2002); *Mumford v. GNC Franchising LLC*, 437 F. Supp. 2d 344, 359 (W.D. Pa. 2006). "The allegation of a relevant market is necessary for claims under Sections 1 and 2 of the Sherman Act . . . ." *Sheet Metal Duct, Inc. v. Lindab, Inc.*, 2000 U.S. Dist. LEXIS 9928 (E.D. Pa. July 18, 2000) (internal citations omitted). Plaintiffs bear the burden of defining this market. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). The boundaries of the relevant product market are drawn by establishing a "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."[9] *Id.* (internal citations and quotation marks omitted).

In most antitrust cases, "proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Id.*. It is error, however, to assume that this proposition is a "*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under *Fed. R. Civ. P. 12(b)(6).*" *Id.* Indeed, when a plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all

---

years, or by both said punishments, in the discretion of the court.

[9] "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Queen City*, 124 F.3d at 437 (quoting *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 206 (3d Cir. 1994)). Factors to consider include price, use, and qualities. *Id.* Cross-elasticity of demand means "the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in the market." *Id.* at 438 (quoting *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991)).

interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.*

For antitrust purposes, a relevant market "is the smallest grouping of sales for which the elasticity of demand and supply are sufficiently low that a firm with 100% of that grouping could profitably reduce output and increase price substantially above marginal cost." Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* § 3.2 at 83 (3d ed. 2005). Hovenkamp uses the example of the automobile market. In considering the passenger car division of Ford Motor Company, Hovenkamp notes that the relevant market for antitrust purposes would be "passenger cars" in general.[10] *Id.* at 83-84. If Ford had a monopoly over all passengers cars, foreign and domestic, it could raise prices and reduce its output and customers would still have to purchase the cars at a higher price because they would lack options, and manufacturers of similar products (such as tractors) would need time and resources to switch over to car-making in order to compete.[11]

This case presents a more complicated notion of what constitutes a relevant market because it incorporates the added wrinkle of the standard franchise agreement. The circumstances of *Queen City* are very similar and are thus instructive. In *Queen City*, franchisees of Domino's Pizza sued the fast-food giant for, *inter alia*, antitrust violations under sections 1 and 2 of the Sherman Act arising out of a franchise agreement. Section 12.2 of the standard Domino's franchise agreement required that "all pizza ingredients, beverages, and packaging materials used by a Domino's

---

[10] This is as opposed to narrower groupings such as "Ford cars" and "American passenger cars," because if Ford raised its prices while having a monopoly over either of those groups, customers could either buy Chevrolet passenger cars or foreign passengers cars and not be forced to pay a premium.

[11] Hovenkamp indicates that it was not necessary to analyze broader markets such as "passenger vehicles" or "vehicles" because "passenger cars" was the smallest market where elasticity of demand would be low enough to constitute a relevant antitrust market.

franchisee conform to the standards set by Domino's Pizza, Inc." and that Domino's, in its sole discretion, may "require that ingredients, supplies and materials used in the preparation, packaging, and delivery of pizza be purchased exclusively from us or from approved suppliers or distributors." *Queen City*, 124 F.3d at 433. Domino's sold 90% of its ingredients and supplies to franchisees, but, with the exception of fresh dough, did not manufacture the products, and instead purchased them from approved suppliers and resold them to franchisees at a markup. *Id.* at 433-34. The franchisee-plaintiffs alleged that Domino's monopolized the aftermarket for sales of supplies to franchisees by (1) restricting franchisees' "ability to purchase competitively priced dough" or make cheaper dough on site; (2) blocking franchisees' attempts to purchase cheaper ingredients from sources other than Domino's; (3) entering into exclusive dealing arrangements with some franchisees for the purpose of denying plaintiffs' purchasing agent from accessing potential buyers; and (4) conditioning the sale of fresh dough on franchisees' purchasing other ingredients and supplies from Domino's. *Id.* at 434.

The district court in *Queen City* disagreed with the plaintiffs that the relevant product market was the market for ingredients and supplies among Domino's franchisees; instead, "the court held that 'antitrust claims predicated upon a "relevant market" defined by the bounds of a franchise agreement are not cognizable.' The court noted that Domino's Pizza, Inc.'s power to force plaintiffs to purchase ingredients and supplies from them stemmed 'not from the unique nature of the product or from its market share in the fast food franchise business, but from the franchise agreement.'" *Id.* at 435. The district court observed that the franchisees could not purchase supplies on the open market because they were contractually obligated to purchase from Domino's – not because Domino's dominated the market therefor or because Domino's was the only supplier in the market. *Id.* The Third Circuit affirmed the district court's rulings on the antitrust claims.

The *Queen City* court continued as follows: "The test for a relevant market is not

commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably

interchangeable by consumers for the same purposes.'" *Queen City*, 124 F.3d at 438.

> A court making a relevant market determination looks not to the
> contractual restraints assumed by a particular plaintiff when
> determining whether a product is interchangeable, but to the uses to
> which the product is put by consumers in general.  Thus, the relevant
> inquiry here is not whether a Domino's franchisee may reasonably
> use both approved or non-approved products interchangeably without
> triggering liability for breach of contract, but whether pizza makers
> in general might use such products interchangeably.

*Id.*  The *Queen City* court explained that were they to adopt the plaintiffs' position "that contractual

restraints render otherwise identical products non-interchangeable for purposes of relevant market

definition, any exclusive dealing arrangement, output or requirement contract, or franchise tying

agreement would support a claim for violation of antitrust laws.  Perhaps for this reason, no court

has defined a relevant product market with reference to the particular contractual restraints of the

plaintiff." *Id.*

Plaintiffs attempt to distinguish *Queen City* by arguing that in *Queen City* the rejected

proposed market was that of "ingredients, supplies, materials, and distribution services" whereas

here, the proposed market is "determined by the franchising aspects of Defendants' franchise

system."  Pl. Opp. Brief at 14.  Such a different proposed relevant market, argue Plaintiffs,

"constitutes a completely different analysis and was not discussed by the Third Circuit in *Queen

City*" and thus the case is irrelevant.  *Id.* at 14.  Paragraph 115 of the Second Amended Complaint

sets out Plaintiffs' proposed market as follows:

> 115.  The numerous aspects of Defendants' operation as stated by
> Defendants are a unique combination of products, services, layout,
> color scheme, decor, signage, trademark, a distinctive method and
> procedure for the preparation and serving of food and beverage
> products, special ingredients, unique and secret recipes for food
> products and distinctive service accessories, including, but not limited

to uniforms, logos, trade dress, menus, packages, containers and similar paper or plastic goods, efficient methods of achieving quality and quantity control and service, standard form plans and specifications for distinctive, standardized premises and characteristic interior and exterior style, design, decor, furnishings, food photography, graphics, equipment layout, and interior and exterior signs, a unique method of operating Defendants Restaurants which is described in its confidential "Operations Manual,"valuable trade names, trademarks and service marks, including but not limited to "Defendants," [sic] a public image that each Restaurant is a unit in an established franchise system and that all Restaurants are operated with uniform standards of service and product quality and quantity that differentiates it from other providers of fast food restaurants ("Unique Services").

Furthermore, Paragraph 120 states that the "geographic relevant market for these Unique Services is the State of Florida,"; Paragraph 121 states that "no other franchisor in the relevant market has a product or service that is the same as the Unique Services"; Paragraph 122 states that there is "no interchangeability between the Unique Services and other franchisors' services"; Paragraph 123 states that there are "no substitutes for the Unique Services"; Paragraph 124 states that there is "no cross-elasticity of demand between the Unique Services and any possible substitutes"; and Paragraph 125 indicates that "Defendants are the only company that provides the Unique Services and has control of 100% of the market for the Unique Services."

Plaintiffs' newly added paragraphs and attempts to distinguish their proposed market from that proposed in *Queen City* is unavailing.  Subsumed within Plaintiffs' proposed market is that which was proposed by the *Queen City* plaintiffs – ingredients, supplies, materials, and distribution services.  Defendants' franchise system – or "Unique Services" as Plaintiffs call it – is nothing more than a conglomeration of specific ingredients, supplies, materials, and services – exactly the items that the *Queen City* court found to be inadequate for a proposed relevant market in an antitrust case.  Also included in Plaintiffs' list are trade names, trademarks, and service marks.  However, these

additional elements do not bolster Plaintiffs' argument.  The law in this district indicates that the value of a trademark does not establish a relevant submarket for an antitrust claim – indeed, "no legal precept stands for [the] proposition" that "every manufacturer of a trademarked product has monopoly power over that product." *Blackwell v. Power Test Corp.*, 540 F. Supp. 802, 810 (D.N.J. 1981) (citing *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 393 (1956)).  Thus, Plaintiffs' argument boils down to the contention that Plaintiffs have a monopoly power over its own "Unique Services" which, taken together, constitute their franchise system.[12]

      This argument is tantamount to arguing, in the Ford Motor Company example above, that the relevant market consists of Ford cars.  Hovenkamp explains that if Ford raised its prices by $1,000, customers "would turn away from Ford cars in droves and go to General Motors, Chrysler, Toyota or some other automobile manufacturer instead.  The likely result of Ford's unilateral $1,000 price increase would be that Ford would lose much of its business.  In that case 'Ford cars' is not a relevant antitrust market." Hovenkamp, *supra*, at 83.  Similarly, Defendants' own franchise system cannot be deemed a relevant market.  As noted in the *Queen City* opinion, "Domino's does not sell a unique product or service" so as to qualify as its own relevant antitrust market based on *Eastman Kodak*, and "there are thousands of franchise opportunities available to investors and disclosure laws

---

     [12]  The Supreme Court, in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), held that "the market for repair parts and services for Kodak photo-copiers was a valid relevant market because repair parts and services for Kodak machines are not interchangeable with the service and parts used to fix other copiers."  *Queen City*, 124 F.2d at 439 (citing *Eastman Kodak*).  The Plaintiffs in *Queen City* argued that *Eastman Kodak* supported its proposed relevant market because the Court's holding indicated that sometimes "a single brand of a product or service may constitute a relevant market.  This is correct where the commodity is unique, and therefore not interchangeable with other products."  *Id.*  However, the *Queen City* court observed that the products and ingredients used in Domino's franchises were not unique, and were interchangeable with other available items on the market (contractual restraints notwithstanding).  *Id.*  Thus, the *Eastman Kodak* uniqueness exception was of no help to the plaintiffs.  Similarly, this exception is of no help to Plaintiffs in this case, as their arguments are analogous to those found in *Queen City*.

to help them make informed choices about these alternatives." *Queen City*, 124 F.2d at 440, 441 n.15.  Furthermore, the Plaintiffs in *Queen City* "must buy Domino's-approved supplies and ingredients not because they are unique, but because they are obligated by contract to do so." *Id.* at 440.  While Plaintiffs, here, may be alleging a broader proposed market encompassing all "unique" aspects of the Villa Pizza franchise, many of those aspects, as noted above, include the same products and services deemed non-unique and legally insufficient for an antitrust market in *Queen City*.  The additional aspects of the overall Villa franchise include trademark concepts which, as aforementioned, do not constitute antitrust markets.  Thus, because Plaintiffs, like Domino's, do not offer truly unique products or services, because customers (here, Plaintiffs and other potential franchisees of Villa Pizza) have reasonably equivalent alternatives for franchise investments in the market, and because Plaintiffs are bound by contract (not by uniqueness) to purchase certain mandated supplies, no relevant antitrust market exists, and Plaintiffs' Sherman Act claims are dismissed.[13]

IV.

The Plaintiffs' Clayton Act claims will be dismissed for the same reason the Sherman Act claims will be dismissed – failure to plead an adequate market.  Various courts from around the country have indicated the necessity of pleading an adequate product market as a prerequisite to

---

[13]  With regard, specifically, to the Section 1 claims, Plaintiffs allege to have pled a "per se" violation of Section 1, and therefore need not plead a relevant market.  Plaintiffs' Second Amended Complaint, at paragraph 147, notes that "Defendants' tying arrangements in its Narrow Path Failure constitutes a *per se* violation of the Sherman Act" and paragraph 148 argues that because of this alleged *per se* violation, "Plaintiffs need not demonstrate that the effects of the tie are unreasonable."  However, this District has held that "[t]ying cases are not . . . subject to per se analysis." *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 361 (D.N.J. 2001).  Thus, Plaintiff must identify a relevant market and has not adequately pled a *per se* Sherman Act violation.

maintaining a Clayton Act tying claim.  In *UltiMed, Inc. v. Becton, Dickinson & Co.*, No. 06-2266, 2006 U.S. Dist. LEXIS 95433, at *16 (D. Minn. Nov. 7, 2006), the Court denied judgment on the pleadings for failure to allege a relevant product market because the plaintiff's pleadings had offered "ample notice of the relevant product market" for the plaintiff's Sherman Act and Clayton Act claims.  In *Streamcast Networks, Inc. v. Skype Techs., S.A.*, No. CV 06-391, 2006 U.S. Dist. LEXIS 97392, at *24-25 (C.D. Cal. Sept. 14, 2006), the court dismissed plaintiffs' antitrust claims (including its Clayton Act claims) because the plaintiff did not "adequately allege/identify a legally cognizable 'relevant product market.'"  In *Evac, LLC v. Pataki*, 89 F. Supp. 2d 250, 261 (N.D.N.Y 2000), the court stated that because the plaintiff "failed to define a relevant product and geographic market and failed to plead the necessary 'antitrust injury,' it does not have standing to bring a claim under the Sherman or Clayton Acts and, thus, these claims are dismissed against all of the Defendants."

## V.

Plaintiff's Robinson-Patman Act claims are also dismissed for failure to adequately plead a relevant market.  "The allegation of a relevant market is necessary for claims under Sections 1 and 2 of the Sherman Act, . . . *as well as under the Robinson-Patman Act*.  Thus, we consider the pleading of the relevant product market as a threshold issue, since if [Plaintiff] has failed to plead a relevant product market, then all its claims in Counts I through IV fail."  *Sheet Metal Duct, Inc. v. Lindab, Inc*., 2000 U.S. Dist. LEXIS 9928 (E.D. Pa. July 18, 2000) (internal citations omitted) (emphasis added).

## VI.

Plaintiffs claim employment discrimination under the ADA because Gilbert was allegedly ousted from Villa training because of his severe psoriasis.  Under the ADA, a "covered entity" is

prohibited from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "covered entity" means "an employer, employment agency, labor organization, or joint labor-management committee." *Id.* § 12111(2).[14]

Under the ADA, employment discrimination liability can only be imposed on employers. *Cella v. Villanova Univ. & Aramark Fac. Servs., Inc.*, No. 01-7181, 2003 U.S. Dist. LEXIS 2192, at *20 (E.D. Pa. Feb. 12, 2003).  The ADA defines "employer" as

> (5) Employer.
>
> (A) In general. The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this title, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.
>
> (B) Exceptions. The term "employer" does not include--
>
> (i) the United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or
>
> (ii) a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of the Internal Revenue Code of 1986.

---

[14]  "In order to establish a prima facie case of disability discrimination within the meaning of the ADA, an employee must demonstrate that he or she, (1) has a disability, (2) is otherwise qualified to perform the essential functions of the job, with or without accommodations by the employer, and (3) has suffered an adverse employment action because of his or her disability.  If the employee makes out a prima facie case of discrimination, the employer may prevail by demonstrating a legitimate, non-discriminatory reason for the adverse action." *Barclay v. AMTRAK*, 240 Fed. Appx. 505, 507 (3d Cir. 2007) (internal citations omitted).

42 U.S.C. § 12111(5).

Plaintiffs state on various occasions in the Second Amended Complaint that the relationship between Plaintiffs and Villa is one of franchisee and franchisor.  *See* paragraphs 28, 36, 37, 55, 63. For purposes of Count VIII, however, Plaintiffs espouse the theory in their opposition brief that "[f]or training purposes Defendants were [sic] the employer of Mr. Gilbert based upon their total control of everything connected with the training."  The Second Amended Complaint contains various conclusory allegations stating that Villa was Plaintiffs' employer.  *See* paragraphs 201, 202, and 203.  In support of this theory, Plaintiffs cite to numerous IRS common law factors to differentiate between an independent contractor and an employee.  These factors are irrelevant; the Third Circuit has held that "the common law test for whether an individual is an employee was not helpful in the context of the anti-discrimination statutes, because the common law test arose in the context of cases dealing with respondeat superior liability and relates to the distinction between an independent contractor and an employee."  *Ziegler v. Anesthesia Assocs. of Lancaster, Ltd.*, 74 Fed. Appx. 197, 200 (3d Cir. 2003).  The IRS test is analogous to the common law test distinguishing between employees and independent contractors and is thus not helpful to an analysis dealing with an antidiscrimination statute such as the ADA.

Plaintiffs then cite to numerous cases that allegedly support the proposition that a franchisor can be considered an employer for purposes of the ADA.  However, the cited cases are distinguishable from the present matter for the following reasons.

*United States v. Days Inn of America, Inc.*, 151 F.3d 822 (8th Cir. 1998) dealt with a lawsuit between the U.S. government and Days Inn for allegedly violating the ADA by failing to construct facilities compliant with ADA accessibility requirements.  The court had to resolve who was liable under the specific provision of the ADA at issue, and decided ultimately that section 303's anti-

discrimination provision was "not limited to owners, operators, lessors and lessees of newly-constructed facilities." *Id.* at 825.  Thus, Days Inn could be held liable for ADA violations along with its franchisees.  However, this case involved a suit by the government against these parties; this was not a case where a franchisee was suing a franchisor.  The issue was merely whether both the franchisee and franchisor could be jointly liable *to the government* for various ADA violations. *Clark v. Burger King Corp.*, 255 F. Supp. 2d 334 (D.N.J. 2003) is similarly distinguishable because plaintiff was ultimately allowed to pursue some of his ADA claims against both Burger King and its franchisees jointly; the plaintiff was a third party suing both franchisee and franchisor, whereas here, the plaintiff does not sue Bueff.[15]  In *Miller v. D.F. Zee's, Inc.*, 31 F. Supp. 2d 792, 805 (D. Or. 1998), the court found there to be a triable issue of fact as to whether Denny's, the franchisor, could be *vicariously liable* for the actions of employees of its franchisee.  The issue was whether the franchisor and franchisee could be considered a single business entity and went to issues of agency and actual or apparent authority.  Again, this case is distinguishable because it dealt with vicarious liability of the franchisor for acts by employees of the franchisee – here, the plaintiff as a principal of the franchisee, Bueff has chosen not to sue Bueff, and the issue of vicarious liability does not arise. The factual differences are simply too great for this case to be persuasive.  Finally, in *Latuga v. Hooters, Inc.*, No. 93-c-7709, 1996 U.S. Dist. LEXIS 4169, at *18-19 (N.D. Ill. March 29, 1996), the District Court found that the Hooters parent company and its franchisees were "so interrelated as to constitute a single employer for Title VII discrimination purposes" because when "a number of business entities are so interrelated that they can fairly be considered a 'single enterprise,' they

---

[15]  Or, Plaintiff Gilbert is at least an employee or a principal of the franchisee corporation, Bueff.  However, even if he is an employee of Bueff, Gilbert is not suing Bueff jointly with Villa or alleging Villa is liable vicariously through Bueff.  Indeed, Gilbert brings this action in the name of Bueff.

will be considered a single employer for purposes of Title VII." *Id.* at *19 (citations omitted). Plaintiffs' contention is that this case stands for the proposition that a franchisor was held liable as an employer; this characterization is only partially true, because the franchisor was held to be liable *jointly* with the franchisees as a single employer for purposes of discrimination against *employees of the franchisee*.

Defendants cite to a case that is much more on point. While still distinguishable in several ways, *Mangram v. General Motors Corp.*, 108 F.3d 61 (4th Cir. 1997) is more analogous than Plaintiffs' proffered case law.[16] In *Mangram*, the plaintiff participated in a GM program for potential minority entrepreneurs which offered classroom and dealership training and a monthly stipend for a year. Mangram was not guaranteed a dealership and signed an agreement indicating that he was not a GM employee. When GM ultimately opted not to offer Mangram a dealership some time after the classroom program had ended, Mangram sued under the ADEA alleging age discrimination based on a comment someone at GM had made about Mangram being too old to run a dealership. The analogous ADEA similarly does not cover non-employees for age-based employment discrimination; the court found that not only was Mangram never an employee of GM, but had actually been awarded a dealership (which is similar to a franchise), such a relationship was "more in the nature of a contractual relationship than" an employer-employee relationship, and Mangram still would not have been a GM employee. *Id.* at 63. The court observed that Mangram "would have been the proprietor of a separate corporation – not a General Motors employee." *Id.* at 64.

The situation here is analogous. As franchisees, Plaintiffs have entered into a contractual

---

[16]  The Court was unable to find any case law directly on point in this circuit or in others. Thus, it is necessary to rely on non-Third-Circuit case law, which is persuasive but not binding. Given the lack of case law on the subject at hand, the *Mangram* case is the closest analogue available at the present time.

relationship with Villa, not an employer-employee relationship.  Their spearheading of a franchise is similar to the situation Mangram would have been in had he started a GM dealership.  Critically, in this case, there is also language in the franchise agreement itself that disclaims any employment relationship – page 33 indicates that the parties are independent contractors and that nothing in the agreement makes the parties employees of the other "for any purpose whatsoever."  The Court finds this all to be persuasive evidence that no such relationship existed.[17]

There is simply no authority to indicate that a franchisee can be considered the employee of a franchisor for purposes of the ADA.  Thus, the ADA is inapplicable in this case and Count VIII will be dismissed.

Even if this Court were to find that Gilbert and/or Beuff were employees of Villa for purposes of the ADA, the claim would fail because Gilbert's psoriasis does not render him disabled within the meaning of the ADA; in this case it does not substantially limit a major life activity.

"ADA makes it unlawful to discriminate 'against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees,…and other terms, conditions and privileges of employment' (42 U.S.C. § 12112(b)(5)(A))." *Turner v. Saloon, Ltd.*, 491 F. Supp. 2d 753, 762 (N.D. Ill. 2007).  As an initial matter, a plaintiff must show that he or she is "disabled within the meaning of the Act.  Under ADA, a disability is a 'physical or mental impairment that substantially limits one or more of the major life activities.'" 42 U.S.C. § 12102(2)(A).  *Kelman v. Foot Locker*, No. 05-2069, 2006 U.S. Dist. LEXIS 83465, at *10 (D.N.J. Nov. 16, 2006).  "Major life activity" is defined as

---

[17]  It should be noted that, although it is not binding on this Court, the EEOC issued a Right-to-Sue Letter to Plaintiff after determining that a dismissal of Plaintiffs' case was appropriate because "No employer-employee relationship" existed.

> functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). "Substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The regulations provide additional factors to consider in determining whether a person is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

*Bukta v. J.C. Penney Co.*, 359 F. Supp. 2d 649, 664 (N.D. Ohio 2004).

Plaintiffs' Second Amended Complaint summarily concludes, in paragraph 208, that "Robert Gilbert's psoriasis substantially limited one or more of his major life activities."  However, the complaint goes on to state that Gilbert "was a skilled chef and a graduate of the [sic] The Culinary Institute of America" (paragraph 211), that Gilbert "had no problem learning the program taught by Villa Enterprises" (paragraph 212), Gilbert persisted "in his demand for training" (paragraph 215), and that his "psoriasis did not interfere with Robert Gilbert's ability to learn how to operate a restaurant" (paragraph 217).  The Second Amended Complaint fails to allege any facts, other than the conclusory allegation in paragraph 208, that show that Gilbert was substantially limited in basic life activities such as walking, sensing, breathing, learning, or working.  In fact, Gilbert wanted to learn at Villa's training program and insisted that he be allowed to stay (and was ultimately allowed to have partial training (paragraph 215)).  Furthermore, Gilbert wanted to work at and, indeed, to run a Villa franchise, and there is nothing in the Second Amended Complaint that indicates that his psoriasis would have affected his ability to work at the franchise or to even manage it.  While psoriasis is a permanent condition, Gilbert does not assert that the impairment is so severe (either during flare-ups or when the condition is dormant), the periods of disability are so long, or that the

long-term effects of the psoriasis are so serious that he is "substantially limited" in a major life activity.

Gilbert is not "disabled" within the meaning of the ADA, and even if the Court had found an employer/employee relationship, the claim would fail on this ground anyway.

VII.

Plaintiffs also direct each count of the Second Amended Complaint at Defendant Wishwell. In the Second Amended Complaint, Plaintiffs state that Wishwell is a New Jersey corporation, is the manager of Villa, and that

1)      Wishwell's actions "were materially and directly responsible for the purchase of Villa Pizza's franchise by Plaintiffs," (paragraph 10);

2)      "Wishwell induced Plaintiffs to purchase Villa Pizza's franchise" (paragraph 11);

3)      "Wishwell benefitted by Plaintiffs purchase of Villa Pizza's franchise" (paragraph 12);

4)      "As manager of Villa Pizza, Wishwell materially and directly aided Villa Pizza in its improper actions as stated in this Second Amended Complaint" (paragraph 13);

5)      "Plaintiffs relied upon the representations in the UFOC, including Wishwell being the 'managing member' of Villa Pizza, in making its decision to purchase Villa Pizza's franchise" (paragraph 15);

6)      "Villa Pizza and Wishwell have the same business address and location" (paragraph 16);

7)      "Plaintiffs relied upon the combination and team of Villa Pizza and Wishwell in making their decision to purchase Villa Pizza's franchise" (paragraph 17);

8)      "As manager and managing member of Villa Pizza, Wishwell materially and directly

aided and abetted Villa Pizza in its improper actions as stated in this Second Amended Complaint" (paragraph 18);

    9)    "Wishwell greatly exceeded the simple status of being the manager of Villa Pizza" (paragraph 19);

    10)    "Wishwell has been materially involved with Plaintiffs as to the operation of their franchise" (paragraph 20); and

    11)    "Wishwell is liable in its own right for the actions that it has taken with Villa Pizza against the interest of Plaintiffs." (paragraph 21).

It should be noted that Plaintiffs seem to be seeking relief from Wishwell for the same alleged infractions by Villa (and Wishwell's alleged participation therein), and thus are effectively arguing that liability should attach to Wishwell, the member of an LLC, through piercing the corporate veil. However, in their opposition brief, Plaintiffs deny any theory of corporate veil piercing and seek to hold Wishwell liable "in its own right for the actions it has taken with Villa Pizza against the interests of Plaintiffs."

As a general proposition, under the New Jersey Limited Liability Company Act,

> Except as otherwise provided by this act, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company; and no member, manager, employee or agent of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company, or for any debt, obligation or liability of any other member, manager, employee or agent of the limited liability company, by reason of being a member, or acting as a manager, employee or agent of the limited liability company.
>
> *N.J. Stat.* § 42:2B-23.

In order to circumvent this statute and pierce the corporate veil, a plaintiff must prove two

elements:

> (1) "[T]he parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent;" and (2) "[T]he parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." Craig v. Lake Asbestos of Que., Ltd., 843 F.2d 145, 149 (3d Cir. 1988) (applying New Jersey law) (quotation omitted). According to the Third Circuit, a court should consider the following factors when determining whether the first element, dominance, has been met: [G]ross undercapitalization[,] failure to observe corporate formalities,  non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. Id. at 150 (quotation omitted). As this Court has previously stated, with respect to the second element, "there must be some 'wrong' beyond simply a judgment creditor's inability to collect (otherwise, the corporate veil would be pierced in virtually every case)." The Mall at IV Group Props., LLC v. Roberts, Civ. Action No. 02-4692, 2005 U.S. Dist. LEXIS 31860, 2005 WL 3338369, at *3 (D.N.J. Dec. 8, 2005) (citing Sea-Land Servs., Inc. v. The Pepper Source, 941 F.2d 519, 522 (7th Cir. 1991)).

*A.I. Credit Consumer Disc. Co. v. Premiere Foods, Inc.*, No. 04-4049, 2007 U.S. Dist. LEXIS 81737, at *11-13 (D.N.J. Nov. 5, 2007).

The Court interprets the claims against Wishwell to be premised on piercing the corporate veil.  Plaintiffs, at paragraph 16 of the Second Amended Complaint, allege that "Villa Pizza and Wishwell have the same business address and location"; in its brief, Plaintiffs note that "Wishwell also figures prominently in that Item 2 of the UFOC . . . shows that (a) the President of Villa Pizza served as the President and Director fo Wishwell, (b) the Executive Vice-President of Villa Pizza served as the Executive Vice-President and Director of Wishwell and (c) the Secretary and Director of Villa Pizza served as the Secretary and Director of Villa Pizza Wishwell [sic]."  Furthermore, as detailed above, Plaintiffs allege that Wishwell "induced" Plaintiffs to purchase the franchise and

"benefitted" from Plaintiffs' franchise purchase, materially aided Villa in its alleged improper actions, was "materially involved" with the operation of the franchise, and "greatly exceeded the simple status of being the manager of Villa Pizza."  It appears to this Court that Plaintiffs are alleging an alter-ego status of Wishwell – that Villa, the main company, is so dominated by the member, Wishwell, that it has no separate existence.  Of particular importance to this allegation is the alleged identity of business locations and company executives.  Furthermore, the Court interprets Plaintiffs' allegations to suffice under the second element of veil piercing – that Wishwell abused its privilege of incorporation to cause an injustice of some sort to Plaintiffs (allegedly breach of contract, fraud, etc.).  At this time, giving all inferences to the Plaintiffs as the Court must do on a motion to dismiss, the Court finds that Plaintiffs have alleged facts "enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations and quotations omitted).  The Court does not herein decide that piercing the corporate veil is appropriate; only that Plaintiffs are entitled to clear the hurdle of Rule 12(b)(6).

Therefore, Defendants' motion to dismiss is denied with regard to the claims against Wishwell.

### VIII.

Defendants' motion to dismiss as it pertains to the antitrust claims (Counts Five through Seven) and the ADA claim (Count Eight) is granted.  The Defendants' motion to dismiss, as it pertains to claims against Wishwell, is denied.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

June 24, 2008